## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## ROCK HILL DIVISION

| | |
|---|---|
| Clayton Carnes and Linda Carnes (h/w), ) | C/A NO. 0:13-591-CMC |
| ) | |
| Plaintiffs, ) | |
| ) | **OPINION and ORDER** |
| v. ) | |
| ) | |
| Eli Lilly and Company, an Indiana ) | |
| Corporation, ) | |
| ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This matter is before the court on motion for summary judgment filed by Defendant Eli Lilly and Company ("Eli Lilly"). Dkt. No. 24. For reasons stated below, the court grants Defendant's motion for summary judgment.

### BACKGROUND

While serving his country in December 2004, Plaintiff Clayton "Scott" Carnes suffered significant spinal cord injury as a result of a helicopter crash while attempting to rescue fellow soldiers in Iraq. As a result, Mr. Carnes is wheelchair bound, has significant physical limitations, and suffers from chronic pain. Since 2008, Mr. Carnes has received treatment at Palmetto Tri-County Medical in Lancaster, South Carolina. In summer 2011, Mr. Carnes reported to Dr. Knight, a physician at Palmetto Tri-County Medical, that he wanted to stop taking Lyrica. Dkt. No. 27-2 at 130; 162-163 (Carnes Dep. 129: 17-25; 161:21-162:10). At that time, Dr. Knight prescribed 60 mg daily of Cymbalta, manufactured by Defendant Eli Lilly. Dkt. No. 27-6 at 62 (Knight. Dep. 61:5-8). Mr. Carnes took Cymbalta under the care of Dr. Knight through December 2011, when Dr. Knight

1

left Palmetto Tri-County Medical. *Id.* at 64:10-15. Dr. Anupama Singaraju took over Mr. Carnes' care upon Dr. Knight's departure. Carnes Dep. 165:17-19.

At Mr. Carnes' first visit with Dr. Singaraju in March 2012, Mr. Carnes complained about weight gain, which he attributed to Cymbalta. Dkt. No. 27-7 at 15-17 (Singaraju Dep. 14:1-17:13). Mr. Carnes informed Dr. Singaraju that he wanted to switch to a different medication. *Id.* at 17:14-16. As a result, Dr. Singaraju reduced his Cymbalta dosage to 30 mg daily.[1] *Id.* at 26:15-21. Dr. Singaraju testified she decided to use the tapering off method to avoid potential side effects from stopping Cymbalta suddenly. *Id.* at 26:25-27:10; 31:3-12. At Mr. Carnes' next visit in June 2012, Dr. Singaraju directed Mr. Carnes to stop Cymbalta and restart Lyrica. *Id.* at 45:12-24; 50:7-52:12.

Mr. Carnes alleges he experienced "severe and dangerous withdrawal symptoms" when he discontinued Cymbalta, including "sharp, painful zaps of electricity shooting from one side of his head to the other," "nightmares," and "anger." Complaint ¶ 35. Mr. Carnes testified that he continues to experience "shakes . . . like a dog getting wet and . . . shaking," which he attributes to Cymbalta. Carnes Dep. 187:7-13.

---

[1] As explained above, Dr. Singaraju testified that she reduced Mr. Carnes' dosage to 30 mg daily at his first visit with her in March 2012. She also testified that in Mr. Carnes' medical records, it simultaneously included both 30 mg and 60 mg of Cymbalta, which she agreed was an error. Singaraju Dep. 47:10-13. Defendant states that, although "Dr. Singaraju reduced Mr. Carnes' Cymbalta dosage to 30 mg [,]. . . it appears that Mr. Carnes continued to be dispensed a 60 mg dose." Dkt. No. 24-1 at 7. Plaintiffs do not address the dosage issue in their opposition brief and do not argue that there is any disputed fact concerning this discrepancy. In Plaintiffs' opposition brief, Plaintiffs merely state that Dr. Singaraju continued to prescribe Cymbalta until the summer of 2012, at which point Plaintiffs suggest that Mr. Carnes decided to terminate Cymbalta. Dkt. No. 27-1 at 5 ("Plaintiff came under the care and treatment of Dr. Anupama Singaraju [a female physician], who prescribed Cymbalta for Plaintiff until the summer of 2012, when *he* ultimately discontinued use of the drug and began experiencing the symptomatology that is the subject of this suit.") (emphasis added).

On March 5, 2013, Mr. Carnes and his wife Linda Carnes ("Plaintiffs") filed this Complaint alleging claims under various product liability theories, including defective design, negligence, failure to warn, strict liability, negligent misrepresentation, fraud, breach of express warranty, breach of implied warranty of merchantability, and violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"). Dkt. No. 1 (Compl.). Plaintiffs allege that Defendant "overstated the efficacy of Cymbalta and understated, downplayed, and/or failed altogether to state the true withdrawal side effects associated with Cymbalta." Compl. ¶ 14. At all relevant times, the Cymbalta label provided the following information about discontinuation:

> "Discontinuation symptoms have been systematically evaluated in patients taking duloxetine [Cymbalta]. Following abrupt or tapered discontinuation in placebo-controlled clinical trials, the following symptoms occurred at a rate greater than or equal to 1% and at a significantly higher rate in duloxetine-treated patients compared to those discontinuing from placebo: dizziness, nausea, headache, fatigue, paresthesia, vomiting, irritability, nightmares, insomnia, diarrhea, anxiety, hyperhidrosis and vertigo . . . ."

*Id.* at ¶ 15. An article published in 2005 states that Defendant's Cymbalta clinical trials show that 44.3% of Cymbalta patients suffered from "discontinuation" symptoms, far above the 1% reported in the product label. *Id.* at ¶ 17. Those clinical trials also showed that "9.6% of Cymbalta users suffered *severe* withdrawal side effects." *Id.* at ¶ 18. A 2012 report by the Institute for Safe Medication Practices indicates that "withdrawal symptoms were reported in 44-50% of patients abruptly discontinuing duloxetine at the end of clinical studies for depression, and more than half of this total did not resolve within a week or two." *Id.* at 27.

Dr. Knight and Dr. Singaraju testified that they were unaware of the clinical trials or articles cited above prior to prescribing Cymbalta to Mr. Carnes. Had Dr. Knight known that Defendant's data showed that 44% of patients taking Cymbalta experienced withdrawal symptoms, he would

3

have been "more aggressive" in counseling his patients about Cymbalta. Knight Dep. 100:3-5. Mr. Carnes testified he would not have taken Cymbalta had he been warned about the risk of withdrawal symptoms. Carnes Dep. 205:24-207:11. Dr. Knight also testified that, had he had this additional information concerning Cymbalta's withdrawal risk, he still would have prescribed Cymbalta to Mr. Carnes in the summer of 2011. Knight Dep. 115:1-17. Dr. Singaraju testified that, had she been provided this additional information, her decision still would have been to taper Mr. Carnes off of Cymbalta. Singaraju Dep. 132:22-133:24.

On September 9, 2013, Defendant filed a motion for summary judgment based on the learned intermediary doctrine. Dkt. No. 24. Plaintiffs responded on October 3, 2013 (Dkt. No. 27), to which Defendant replied on October 15, 2013 (Dkt. No. 28).

## STANDARD

*A. Summary Judgment*

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Rule 56(c)(1) provides as follows:

>   (1)   A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>>   (A)   citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers or other materials; or
>>
>>   (b)   showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). The non-moving party cannot create a genuine issue of material fact by presenting his or her own conflicting versions of events. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

   *B. Products Liability*

"Under South Carolina law, a 'products liability case may be brought under several theories, including negligence, strict liability, and warranty.'" *Sauls v. Wyeth Pharms., Inc.*, 846 F. Supp. 2d 499, 502 (D.S.C. 2012) (quoting *Rife v. Hitachi Constr. Mach. Co.*, 609 S.E.2d 565, 568 (S.C. Ct. App. 2005). Proximate causation is critical to any theory under which a products liability case proceeds, and requires a showing that "'the injury occurred because the product was in a defective condition unreasonably dangerous to the user.'" *Id.* (quoting *Holst v. KCI Konecranes Int'l Corp.*,

699 S.E.2d 715, 719 (S.C. Ct. App. 2010)).[2]  Prescription drugs are neither defective nor unreasonably dangerous if accompanied by proper directions and warnings.  *See Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1229-30 (4th Cir.1984) (explaining that prescription drugs often cause unwanted side effects and are deemed "unavoidably unsafe," but are not defective or unreasonably dangerous if adequate warnings of potential side effects are included).  "Failure to give such a warning constitutes a 'defect' in the product and renders the manufacturer liable for selling a product in an unreasonably dangerous manner."  *Id.* at 1230.

In South Carolina, the learned intermediary doctrine applies to prescription drug manufacturers.  *Odom v. G.D. Searle & Co.*, 979 F.2d 1001, 1003 (4th Cir. 1992).  Under the learned intermediary doctrine, "the manufacturer's duty to warn extends only to the prescribing physician, who then assumes responsibility for advising the individual patient of risks associated with the drug or device."  *Id.*  In a prescription drug case, a plaintiff must not only show that the drug manufacturer's warning was inadequate, but "also establish that the inadequacy of the warning was the proximate cause of the plaintiff's injury."  *Sauls*, 846 F. Supp. 2d at 502 (citing *Stanback v. Parke, Davis, & Co.*, 657 F.2d 642, 645 (4th Cir. 1981)).  In light of the learned intermediary doctrine, "the burden remains on the plaintiff to demonstrate that the additional non-disclosed risk was sufficiently high that it would have changed the treating physician's decision to prescribe the product for the plaintiff."  *Odom*, 979 F.2d at 1003.

---

[2] Proximate causation is also a necessary element of a claim under the SCUTPA.  *See Wright v. Craft*, 640 S.E.2d 486, 498 (S.C. Ct. App. 2006) (To establish a claim under the SCUTPA, a plaintiff must prove: "(1) the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair or deceptive act affected public interest; and (3) the plaintiff suffered monetary or property loss as a result of the defendant's unfair or deceptive act(s).").

**DISCUSSION**

Defendant argues it is entitled to summary judgment because Plaintiffs cannot establish proximate causation, which is an element of all of Plaintiffs' claims.[3] Defendant contends Dr. Knight testified he would not have changed his decision to prescribe Cymbalta had he been provided additional warnings about withdrawal symptoms, which Plaintiffs allege should have been provided. Dkt. No. 24-1 at 14-17. Defendant also contends Dr. Knight had independent knowledge of the risk of withdrawal symptoms associated with Cymbalta (*id.* at 10-14), and that Dr. Knight did not rely on the Cymbalta label for risk information when prescribing Cymbalta to Mr. Carnes. *Id.* at 17-19.

Plaintiffs first argue that, under South Carolina law, it is unsettled whether the learned intermediary doctrine applies in a prescription drug failure-to-warn case against a drug manufacturer. Dkt. No. 27-1 at 7. In 1984, the Fourth Circuit explained in a failure-to-warn medical device case that, "[a]lthough the South Carolina Supreme Court has not addressed the issue, we conclude it would adopt the [learned intermediary doctrine], generally accepted and supported by sound policy, restricting the manufacturer's duty to warn to the prescribing physician." *Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1231 (4th Cir. 1984). In 1992, the Fourth Circuit applied the learned intermediary doctrine in a failure-to-warn case concerning a prescribed intrauterine device ("IUD"), and explained that the doctrine applies to physicians prescribing "drug[s] or device[s].". *Odom v. G.D. Searle & Co.*, 979 F.2d 1001, 1003 (4th Cir. 1992). *Odom* has not been overruled, and it has continuously been followed by district courts within South Carolina. *See, e.g.*, *Sauls v. Wyeth Pharms., Inc.*, 846 F. Supp. 2d 499 (D.S.C. 2012) (applying learned intermediary doctrine in case involving prescription drugs); *Fisher v. Pelstring*, 817 F. Supp. 2d 791 (D.S.C. 2011) (same). Plaintiffs have not identified,

---

[3] Plaintiffs do not dispute that proximate causation is an element of all of their claims.

and the court is unaware of, any decision from the South Carolina Supreme Court or Court of Appeals rejecting the learned intermediary doctrine in a prescription drug case.[4] The court, therefore, is bound to follow the law of this Circuit as set forth in *Odom*.

Plaintiffs argue that, even assuming the learned intermediary doctrine applies to this case, genuine issues of material fact preclude summary judgment. Dkt. No. 27-1 at 8. Specifically, Plaintiffs argue that there are issues of fact as to (1) whether Dr. Knight was adequately informed of Cymbalta's withdrawal risks (*id.* at 8-14); (2) proximate causation (*id.* at 14-18); and (3) whether Dr. Knight relied on Cymbalta's product labeling (*id.* at 14-21).

To determine whether Plaintiffs have established proximate causation, the court need not evaluate the adequacy of Cymbalta's warning. Rather, the court must consider whether Mr. Carnes' physician would have changed his prescribing decision had there been a different warning. *See Odom*, 979 F.3d at 1003 ("The sole issue in this case, therefore, is whether an appropriate warning to Odom's doctor about the risk of sterility would have deterred him from prescribing the IUD."); *Sauls*, 846 F. Supp. 2d at 504 ("Numerous courts have concluded that a plaintiff fails to carry her burden in establishing proximate cause in the absence of any evidence demonstrating how an adequate warning would have altered a physician's prescription decision."). As two physicians prescribed Cymbalta for Mr. Carnes, the court considers each physician below.

**Dr. Knight.** Dr. Knight testified that, had he been provided the warning Plaintiffs allege would have been adequate, he still would have prescribed Cymbalta to Mr. Carnes in the summer

---

[4] *See Madison Am. Home Prods. Corp.*, 595 S.E.2d 493, 496 (S.C. 2004) (in rejecting strict liability claim against pharmacist for dispensing drugs as prescribed, court explained "strict liability [for pharmacists] is inconsistent with the learned intermediary doctrine, which places the duty to warn on the prescribing physicians, and not pharmacists . . . .").

of 2011.[5]  Plaintiffs attempt to create a genuine issue of material fact by citing to an earlier portion of Dr. Knight's deposition in which Dr. Knight agreed with counsel's statement that "prescribing a drug for a patient is a joint decision-making process." Dkt. No. 27-1 at 14-15.  Without any legal authority, Plaintiffs attempt to displace the learned intermediary doctrine by characterizing Dr. Knight's process of prescribing a drug as a joint decision between himself and his patient.  Plaintiffs further argue that had a stronger warning been included, Dr. Knight would have conveyed the risk to Mr. Carnes, who testified he would not have taken Cymbalta had he been informed of the risk of withdrawal symptoms.  *Id.* at 15-17.  Once again, Plaintiffs attempt to shift focus to the patient's decision to take the prescription drug, despite the learned intermediary doctrine, which requires the court to focus on the physician's decision to prescribe the drug.  Plaintiffs have failed to identify any testimony creating a genuine issue of material fact that a stronger warning would have altered Dr. Knight's prescribing decision.

---

[5] Dr. Knight testified as followed:

Q: Okay. Now, I want to ask you one more question. Let's say you had before you the QuarterWatch article that [Plaintiffs' counsel] showed you and the entire Perahia article that he -- that I've just shown you with this --

A [Knight]: Uh-huh.

Q: -- hard data, and you were with Mr. Carnes, deciding whether or not to prescribe Cymbalta to him, given how he presented to you and his medical history in the summer of 2011, would you have still made the decision to prescribe Cymbalta as the most appropriate medicine for him at that point?

[objection omitted]

A: I would have.  Because I still think that the benefit would outweigh the risk.

Knight Dep. 115:1-17.

Further, Defendant argues that, despite Dr. Knight's unawareness of the articles and studies cited by Plaintiffs, Dr. Knight had independent knowledge of the risk of withdrawal symptoms through his training and his own experience. Dkt. No. 24-1 at 10. Defendant cite to Dr. Knight's testimony that he knew of withdrawal symptoms associated with Cymbalta, having learned about them in medical school, during his residency, and from patients who experienced withdrawal symptoms. *Id.* at 10-11 (citing Knight Dep. 13:1-15:7). He agreed that he knew of the following withdrawal symptoms: dizziness, nausea, headache, paresthesia, fatigue, vomiting, irritability, insomnia, diarrhea, anxiety and hyperhidrosis. Knight Dep. 41:20-42:12. Dr. Knight also testified that "more than half" of his patients experienced some type of withdrawal symptom following abrupt discontinuation of Cymbalta. *Id.* at 47:22-48:6.

Defendant contends that, because Dr. Knight had independent knowledge of the risk of withdrawal symptoms and the frequency of risk of withdrawal upon abrupt termination of Cymbalta, any failure to warn Dr. Knight did not cause Mr. Carnes' injuries. Dkt. No. 24-1 at 14 (citing *Odom*, 979 F.2d at 1003). In *Odom*, while applying the learned intermediary doctrine, the Fourth Circuit cited the treating physician's independent knowledge of the risk of pelvic inflammatory disease associated with intrauterine devices (IUDs), as well as the physician's own estimate of the risk, which "exceeded that of Mrs. Odom's expert." 979 F.2d at 1003. The court explained "[t]hat knowledge did not alter [the physician's] stated judgment that in 1979, the Cu-7 IUD was an appropriate contraceptive for women who wanted to have more children in the future, and that it remains so today." *Id.* The court affirmed summary judgment in favor of the manufacturer. Here, Dr. Knight had knowledge of the risk of withdrawal symptoms associated with Cymbalta independent of any warning included on Cymbalta's product label. Dr. Knight also estimated that

"more than half" of his patients experienced withdrawal symptoms upon abrupt discontinuation, which is more than the frequency of risk cited by Plaintiffs (44%–50%).

Plaintiffs argue that any independent knowledge Dr. Knight had about withdrawal symptoms was inadequate. Dkt. No. 27-1 at 11-12. Plaintiffs highlight that Dr. Knight had only prescribed Cymbalta to approximately 50 patients. *Id.* Although more than half of those patients experienced withdrawal symptoms, Plaintiffs contend that such a small sample size is inadequate to inform Dr. Knight of the actual risk.[6] *Id.* Contrary to Plaintiffs' position, courts have found physicians to have independent knowledge of risks associated with prescribed devices and drugs based, at least in part, on clinical experience. *See Odom*, 979 F.2d at 1003 (citing physician's testimony that he had independent knowledge of risk through own experience and training); *Porterfield v. Ethicon, Inc.*, 183 F.3d 464, 468 (5th Cir. 1999) (applying learned intermediary doctrine, no proximate causation where physician knew of risk associated with implanted mesh based on surgical literature, own experience, and colleagues' experience).

---

[6] Plaintiffs do not argue that Dr. Knight was unaware of certain withdrawal symptoms or of the frequency of withdrawal symptoms. Rather, Plaintiffs argue that Dr. Knight's knowledge was insufficient because it was based on his own experience, as opposed to "statistically significant" research:

> Over the course of his entire career as a practicing physician, Dr. Knight has had the occasion to prescribe Cymbalta for only about fifty (50) patients, which he characterized as just **5%** of his entire patient population – "if that much." By contrast, the 2005 JAD article contained a pooled analysis, collected from nine multi-center clinical trials, involving 2,008 total patients. The extensive research laid out in the JAD article was focused entirely on Cymbalta withdrawal symptoms and the authors reached conclusions about statistical significance, two facets absent from Dr. Knight's un-memorialized observations in clinical practice.

Dkt. No. 27-1 at 11-12 (footnotes omitted).

11

In light of Dr. Knight's testimony that he had independent knowledge of the risk of withdrawal symptoms associated with Cymbalta and the frequency of that risk upon abrupt discontinuation, and that he still would have prescribed Cymbalta for Mr. Carnes had he been presented with a stronger warning, Plaintiffs have failed to establish that Mr. Carnes' injuries were proximately caused by Defendant's failure to adequately warn Dr. Knight of the risk of withdrawal symptoms associated with Cymbalta.[7]

**Dr. Singaraju.** Plaintiffs contend that Dr. Singaraju testified that a stronger warning would have changed her prescribing decision:

> Lilly counsel asked Dr. Singaraju whether she would still prescribe Cymbalta for Plaintiff if the product labeling had disclosed the heightened risk. The first time, she responded: "I'm not sure." When Lilly counsel pressed, asking Dr. Singaraju whether she would still continue Plaintiff on the drug if the heightened risk had been disclosed, she answered flatly: "No."

Dkt. No. 27-1 at 5 (footnotes omitted). Contrary to Plaintiffs' characterization, "[w]hen Lilly counsel pressed," Dr. Singaraju testified as follows:

> Q: So if the label for Cymbalta, when you first saw him in March of 2012, had a 45 percent discontinuation rate on it, would you have continued to prescribe that medication for him in that reduced rate?
>
> A [Singaraju]: No.
>
> Q: Even though it said that – well, did you want to taper him off of the drug?
>
> A: Yes. I mean, I would probably watch him closely or follow up more closely.
>
> Q: At that point in time –

---

[7] Defendant also contends that Dr. Knight did not rely on the Cymbalta label when prescribing Cymbalta to Mr. Carnes. Dkt. No. 24-1 at 17-19. In light of the court's determination that Dr. Knight would not have changed his prescribing decision had a stronger warner been issued, the court need not reach what Defendant describes as an "independent basis for finding no proximate cause." Dkt. No. 24-1 at 18.

> A: Yes.
>
> Q: – would – your choice would have been to gradually reduce the dose –
>
> A: Uh-huh.
>
> Q: – or discontinue him altogether?
>
> A: Gradually reduce.
>
> Q: And would it be a better course of action to gradually reduce the dosage?
>
> A: Yes.
>
> Q: So, Doctor, even if the label had this information that [Plaintiffs' counsel] has suggested to you that it should have, that it should have a rate of 45 percent, would you still have gradually reduced that dose for Mr. Carnes?
>
> A: Yes.

Singaraju Dep. 132:22-133:24.

Dr. Singaraju did not make the initial decision to prescribe Cymbalta for Mr. Carnes, but rather began treating Mr. Carnes while he was taking Cymbalta in a 60 mg dose. Dr. Singaraju decided first to lower the dose to 30 mg and then to terminate Cymbalta completely and prescribe Lyrica. Contrary to Plaintiffs' characterization of Dr. Singaraju's testimony, Dr. Singaraju did not state that her decision to taper Mr. Carnes' Cymbalta prescription would have been affected by a stronger warning.[8] Plaintiffs have, therefore, failed to establish that Mr. Carnes' injuries were

---

[8] Mr. Carnes testified that he did not recall Dr. Singaraju reducing his Cymbalta dosage to 30 mg. Mr. Carnes also testified that when he initially informed Dr. Singaraju about his desire to stop taking Cymbalta due to weight gain, Dr. Singaraju did not talk to him about "tapering down on the dosage" and "said that stopping Cymbalta should be okay. She said, you shouldn't have any side effects from doing that." Carnes Dep. 168: 18-24. Mr. Carnes testified that, at the same visit, Dr. Singaraju prescribed Lyrica, but that he did not start taking Lyrica. Carnes Dep. 175: 16-19; 191: 15-18.

As explained earlier, Plaintiffs do not raise the dosage issue in their opposition brief. Even assuming a factual dispute exists as to whether Dr. Singaraju prescribed a lower dosage at the March

proximately caused by Defendant's failure to adequate warn Dr. Singaraju of the risk of withdrawal symptoms associated with Cymbalta.

Plaintiffs' claims, therefore, fail because Plaintiffs cannot establish that Defendant's failure to adequately warn of the risk of withdrawal symptoms associated with Cymbalta proximately caused Mr. Carnes' injuries.

## CONCLUSION

For reasons stated above, Defendant's motion for summary judgment is granted.

**IT IS SO ORDERED.**

s/ Cameron McGowan Currie<br>
CAMERON MCGOWAN CURRIE<br>
Senior United States District Judge

Columbia, South Carolina
December 16, 2013

---

2012 appointment as part of a tapering down method, Mr. Carnes testified that his wife split his Cymbalta tablets (60 mg) for some period to relieve or reduce withdrawal symptoms. Mr. Carnes explained that, after initially stopping Cymbalta, he experienced "zapping." Mr. Carnes started taking Cymbalta again to relieve his symptoms until his wife developed the idea of "cutting the dosage down." Mr. Carnes testified that his wife accomplished this by "pulling [the pills] apart, raking out all the pellets in there, getting a smaller dosage, putting the pills back together and then giving them to me, to lessen the dosage." Carnes Dep. 177:4-7. Mr. Carnes did not provide any time frame for this process.

There appears to be no dispute that Mr. Carnes was, in fact, taking a reduced dosage of Cymbalta during the discontinuation process. Plaintiffs have not established that a stronger warning of the risk of withdrawal symptoms upon abrupt discontinuation would have altered the discontinuation process utilized by Mr. Carnes.